# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 4:16-cr-00230-01 |
| | : | |
| v. | : | (Judge Brann) |
| | : | |
| SHAKEEN ASMAR TAYLOR, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

## October 18, 2016

## I.      BACKGROUND

On August 11, 2016, a federal grand jury sitting in Williamsport indicted the Defendant, Shakeen Asmar Taylor, along with Jarrett Craddock on one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 and one count of distribution/possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1).[1] According to the indictment, at least as early as August 1, 2016, Mr. Taylor and Mr. Craddock had become confederates in a sweeping drug conspiracy whose primary end was the distribution heroin throughout the greater Williamsport area.[2]

---

[1]   ECF No. 1.
[2]   Id. at 1–2.

- 1 -

As the Government characterizes the events in question, Mr. Taylor, along with Kalif English, Corey Hughes, and other co-conspirators, worked in tandem to "operate[ ] an extensive drug trafficking network," which network relied primarily on the use of mobile phones to conduct business.[3] Remarkably, the Government further contends that certain of its witnesses would be prepared to testify that the cell phones managed by Mr. Taylor were, on some days, responsible for generating as much as $10,000.00 in heroin sales alone, one of the many astonishing figures that speak to the extensive scale of the conspiracy that Mr. Taylor had joined.[4]

In that vein, the Government notes that it anticipates filing a superseding indictment that would join Mr. Taylor and Mr. Craddock with the other nineteen defendants previously named in the first round of indictments of Mr. Taylor's co-conspirators in the case United States v. Brown, et al., which is simultaneously being prosecuted before this Court.[5] The operative indictment in that originating case affirms that co-conspirators managed a vast drug distribution network, whose agents originated in Philadelphia, Pennsylvania and utilized rental cars

---

[3]   ECF No. 29 at 1.

[4]   Id.

[5]   4:16-cr-00019.

and other forms of transportation to infiltrate various locales along the Interstate 80 corridor in both Columbia and Lycoming Counties.

As counsel for the Government has subsequently commented in several guilty plea hearings in that matter, the hallmark of that drug distribution network at the center of these cases was its ability to quickly respond to heroin orders and deploy throughout the region, a core set of cell phone numbers well known to loyal drug customers having formed the digital business platform of that conspiracy.

Specifically, the Government contends that, for his part, Mr. Taylor both called upon multiple underlings to assist him in satisfying customer calls for heroin on the subject phones and also surreptitiously traveled to the Williamsport area from Philadelphia, using a variety of rental vehicles, to deliver heroin to his buyers firsthand.[6] According to the Government, Mr. Taylor "operated the drug trafficking network in a mobile and stealthy manner. To avoid police detection, he used local motels . . . as bases of operation and a

---

[6]    ECF No. 29 at 1–2.

number of different meeting locations at park-and-ride areas, shopping malls,

and commercial plaza to conduct drug transactions."[7]

Contemporaneous with Mr. Taylor's original charging by way of Criminal

Complaint, United States Magistrate Judge William I. Arbuckle, III, held

Defendant's arraignment on August 4, 2016, at which time the Government

moved for a subsequent detention hearing, given that the charges in the

indictment were sufficient to trigger the rebuttable presumption of detention at

18 U.S.C. § 3142(f)(1)(C).[8] That detention hearing was held on August 9, 2016.[9] At

the hearing, Robert Cronin, Esquire, who served as counsel for Mr. Taylor at that

time but was thereafter granted leave to withdraw, did not oppose detention, but

reserved the right to request pretrial release at a later date.[10]

Magistrate Judge Arbuckle ordered that the Defendant remain detained.[11]

At Mr. Taylor's subsequent arraignment following his federal indictment, Judge

Arbuckle entered an order continuing his detention.[12]

---

[7]   Id. at 2.

[8]   ECF No. 5. See also 21 U.S.C. § 841(b)(1)(A)–(C).

[9]   ECF No. 10.

[10]   ECF No. 9.

[11]   Id.

[12]   ECF No. 22.

Mr. Taylor filed his motion seeking reconsideration of Magistrate Judge Arbuckle's order of detention on September 7, 2016. The motion ripened on October 11, 2016, when the Defendant's reply brief deadline passed. In accordance with the following reasoning, Magistrate Judge Arbuckle's order of detention as to the Defendant is affirmed and shall remain in full force and effect pending trial.

## II.    LAW

The Bail Reform Act of 1984 governs disposition of the instant motion for reconsideration.[13] The Act "reflects the deep public concern about the growing problem of crimes committed by persons on release" and recognizes that "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons."[14]

---

[13]  See 18 U.S.C. § 3141 et seq.

[14]  United States v. Gatto, 727 F. Supp. 903, 910 (D.N.J. 1989) (quoting United States v. Accetturo, 783 F.2d 382, 384 (3d Cir.1986)).

Section 3145(b) of the Bail Reform Act, entitled "Review of a Detention

Order," outlines the district court's role in reviewing a magistrate judge's

detention order as follows:

> If a person is ordered detained by a magistrate judge, or by a person
> other than a judge of a court having original jurisdiction over the
> offense and other than a Federal appellate court, the person may file,
> with the court having original jurisdiction over the offense, a motion
> for revocation or amendment of the order. The motion shall be
> determined promptly.

In <u>United States v. Delker</u>, the Honorable Arlin M. Adams, writing for the

United States Court of Appeals for the Third Circuit, explained that the district

court's review of a magistrate's detention order is a <u>de novo</u>, independent

determination.[15] The district court should ultimately decide the propriety of

detention without deference to the magistrate judge's conclusion, should not rely

solely on the findings and recommendations of the magistrate, but should

provide its own findings of fact and statement of reasons for its ultimate

decision.[16]

"While this Court must make an independent review of the evidence, it

need not conduct a <u>de novo</u> detention hearing but may rely upon the record of

---

[15]   757 F.2d 1390.

[16]   <u>United States v. Fortna</u>, 769 F.2d 245 (5th Cir. 1985).

the evidence given before the magistrate judge."[17] "A detention hearing may be

reopened if the Court finds that 'information exists that was not known to the

movant at the time of the hearing and that has a material bearing' on the issue of

detention."[18] "Courts have interpreted this provision strictly, holding that

hearings should NOT be reopened if the evidence was available at the time of the

hearing."[19]

For determining the appropriateness of detention, Section 3142(g) of the

Bail Reform Act, entitled "Factors to Be Considered," provides as follows:

> The judicial officer shall, in determining whether there are
> conditions of release that will reasonably assure the appearance of
> the person as required and the safety of any other person and the
> community, take into account the available information
> concerning—
>
> (1)    the nature and circumstances of the offense charged,
>        including whether the offense is a crime of violence, a
>        violation of section 1591, a Federal crime of terrorism, or
>        involves a minor victim or a controlled substance, firearm,
>        explosive, or destructive device;
>
> (2)    the weight of the evidence against the person;

---

[17]   United States v. Lee, 156 F. Supp. 2d 620, 623 (E.D. La. 2001).

[18]   United States v. Gallo, No. 12-20630-CR, 2014 WL 1230717, at *3 (S.D. Fla. Mar. 25,
       2014) (quoting 18 U.S.C. § 3142(f)).

[19]   United States v. Merola, No. CRIM 08-327 SRC MAS, 2008 WL 4449624, at *2 (D.N.J.
       Sept. 30, 2008) (capitalization in original). See also United States v. Dillon, 938 F.2d
       1412, 1415 (1st Cir. 1991); United States v. Hare, 873 F.2d 796 (5th Cir. 1989).

(3)     the history and characteristics of the person, including—

    (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

Typically, the Government's burden in demonstrating risk of flight

justifying pretrial detention is the preponderance of the evidence standard.[20] The

---

[20]   United States v. Himler, 797 F.2d 156, 161 (3d Cir.1986).

Government's burden in demonstrating danger to the community justifying pretrial detention is instead the clear and convincing standard.[21]

More directly, however, in cases such as this one where the Controlled Substances Act provides for a maximum term of imprisonment of ten years or more, Congress has created a rebuttable presumption that the defendant should be detained pending trial because no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. The statutory presumption of detention is enumerated at § 3142(e)(3)(A) of the Bail Reform Act and provides as follows:

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act.

Critically, the Third Circuit has held that "the indictment is sufficient to support a finding of probable cause triggering the rebuttable presumption of dangerousness under § 3142(e)."[22]

---

[21]  Id. at 160.

[22]  United States v. Suppa, 799 F.2d 115, 119 (3d Cir. 1986).

It is the defendant's burden to rebut that presumption.[23] To rebut the presumption of detention, the defendant "must produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community."[24]

## III.   ANALYSIS

Considering the evidence as presented and the factors set forth in 18 U.S.C. § 3142, the Defendant has failed to overcome the statutory presumption of detention. Consequently, Magistrate Judge Arbuckle's order of detention shall remain in full force and effect pending trial. Likewise, for the reasons that follow, this Court need not reopen Defendant's detention hearing.

### A.   The Detention Order Is Upheld Because the Defendant Has Failed To Overcome the Statutory Presumption of Detention.

The Court must first consider, <u>de novo</u>, whether Mr. Taylor has overcome the statutory presumption of detention set forth at 18 U.S.C. § 3142(e)(3)(A) for crimes warranting a maximum term of imprisonment of ten years or more under the Controlled Substances Act. He has not.

---

[23]   18 U.S.C. § 3142(e)(3)(A).

[24]   <u>United States v. Carbone</u>, 793 F.2d 559, 560 (3d Cir. 1986).

The statutory presumption of detention enumerated at § 3142(e)(3)(A)

provides as follows:

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act.

According to the Government and as previously noted, Mr. Taylor, along

with Kalif English, Corey Hughes, and other co-conspirators, are alleged to have

operated an extensive drug trafficking network in Williamsport and its

surrounding areas. Dealers in that drug distribution network often used rental

cars when traveling from Philadelphia to meet the needs of their Central

Pennsylvania customers. Specifically, the Government contends that Mr. Taylor

either directed other dealers to meet drug customers or delivered drugs firsthand

in Central Pennsylvania on several occasions. With these allegations in mind, it is

important to recall the Third Circuit's fundamental instruction that, even when

considered alone, "the indictment is sufficient to support a finding of probable

cause triggering the rebuttable presumption of dangerousness under § 3142(e)."[25]

---

[25]   United States v. Suppa, 799 F.2d 115, 119 (3d Cir. 1986).

Turning to the alleged offense conduct attributable to Mr. Taylor, the Government recounts that on August 3, 2016, the day of his arrest, police conducting surveillance observed him traveling with co-defendant Craddock in a rented Ford Taurus.[26] According to investigators, the pair was allegedly driving to various locales between Danville and Williamsport to meet heroin customers.[27] Based upon its investigation, the Government represents that it can attribute to Mr. Taylor the delivery of at least 50 bags of heroin to a confidential human source that day.[28]

Later on in their travels, the duo was stopped by a Pennsylvania State Police trooper.[29] At the time of the stop, Mr. Taylor had $355.00 in cash on his person, and Mr. Craddock possessed just under $2,000.00 in cash, which bills were stuffed inside the various pockets in his pants.[30] Within the vehicle, the trooper discovered a mobile device known by investigators to have received calls and text messages from heroin customers, in addition to 53 blue packets of heroin secreted in the center console between the two men.

---

[26]   ECF No. 29 at 2.
[27]   Id.
[28]   Id.
[29]   Id. at 2–3.
[30]   Id. at 2.

- 12 -

When viewed more broadly, the Defendant's criminal history is, as the Government describes it, "significant."[31] All told, Mr. Taylor's criminal history reveals four juvenile arrests in Philadelphia and four adult arrests in Philadelphia and Williamsport.[32] On November 14, 2006, Mr. Taylor was convicted in the Lycoming County Court of Common Pleas on the felony charge of possession with intent to a distribute a controlled substance, and he received a sentence of two to five years in state prison. Mr. Taylor was paroled on May 6, 2008, but within six months of his release, was recommitted as a parole violator—a track record quite enlightening as I consider the present request for pretrial release.[33] After being discharged from state parole in August 2011, Mr. Taylor was arrested on two occasions: initially on March 6, 2013 in Philadelphia for possession of a controlled substance (a charge that was later dismissed) and then again for receiving stolen property and possession of a firearm without a license in Luzerne County on September 10, 2014 (a case in which prosecution was withdrawn).[34]

---

[31]   Id. at 6.
[32]   Id.
[33]   Id.
[34]   Id.

Tellingly, when Mr. Taylor was arrested on September 10, 2014 in

Hazleton, Luzerne County, Pennsylvania, he was operating a GMC station

wagon on Interstate 80 with a male passenger, at which time Pennsylvania State

Police troopers initiated a stop due to perceived traffic violations.[35] Troopers

detected the odor of marijuana and noticed that Mr. Taylor and his passenger

appeared nervous.[36] At the same time, the troopers noticed several small rubber

bands, items commonly used to bundle small baggies of heroin, located in the

vehicle's center console.[37]

After Mr. Taylor refused to consent to a search, troopers called for a

certified drug-detection dog to sniff the odors emanating from the exterior panels

of the vehicle.[38] The dog, in turn, alerted for the presence of controlled

substances, and the troopers proceeded to conduct a lawful search of the

vehicle.[39] Once inside, the officers discovered, among other items, additional

drug paraphernalia, including small rubber bands and baggies, all of which

were, in their opinion, suggestive of drug packaging and distribution.

---

[35] <u>Id.</u> at 4.
[36] <u>Id.</u>
[37] <u>Id.</u>
[38] <u>Id.</u>
[39] <u>Id.</u>

This Court is further troubled by the extent to which Mr. Taylor has incorporated the use of firearms into his criminal repertoire. For instance, the Government reports that police officers, during the course of the September 2014 traffic stop described immediately above, also recovered a stolen Glock .40 semi-automatic pistol located within a concealed compartment just above the passenger's side glove box.[40] The firearm had previously been reported stolen by the Lower Frederick Township Police Department.[41]

In addition, agents with the Federal Bureau of Investigation have represented that, as recently as February 20, 2016, Mr. Taylor and an unidentified male purchased a box of American Eagle 5.56 AR rifle ammunition and an AR-15 rifle magazine at Gander Mountain in the Lycoming Mall in Muncy.[42] At the time, Mr. Taylor and the unknown male were operating a white Chevrolet vehicle that had been rented by a known female associate of Mr. Taylor's.[43] Now having come full circle, a search of the flip-phone attributable to co-defendant

---

[40]  Id. at 5.
[41]  Id.
[42]  Id.
[43]  Id.

Craddock that was recovered during the pair's August 2016 arrest uncovered a photo depicting an AR-15 rifle on a bed.[44]

To that end and considering the Defendant's apparent penchant for firearms, I would note that in United States v. Singleton, the United States Court of Appeals for the District of Columbia Circuit acknowledged that "felons with guns may as a class be more likely than non-felons with guns or felons without guns to commit violent acts."[45] Similarly, in United States v. Silva, the United States District Court for the District of Massachusetts wrote, "We think it undeniable that possession of a gun also gives rise to some risk that the gun may be used in an act of violence. By definition, without possessing a gun, one cannot use a gun for the commission of a violent act; with a gun, one can."[46] "Possession of a gun increases one's ability to inflict harm on others and therefore involves some risk of violence."[47] Moreover, as the United States Court of Appeals for the Second Circuit succinctly described the connection between gun violence and the safety of our communities:

---

[44]  Id.
[45]  182 F.3d 7, 15 (D.C. Cir. 1999).
[46]  133 F. Supp. 2d 104, 111 (D. Mass. 2001).
[47]  Id.

> Criminals who are intent on committing bank robberies, murders, extortions and other crimes of violence characteristically possess guns to aid them in such criminal acts. Without possession of guns such persons are far less capable of committing acts of violence. The prohibition of gun possession by previously convicted criminals seeks to protect society by reducing the risk of violence that may result from the possession of guns by persons inclined to crime. By possessing guns in violation of that law, previously convicted criminals increase the risk that they may engage in violent acts. The risk results from the nature of the offense.[48]

Finally, I note that Mr. Taylor is alleged not have been a lone wolf but rather to have acted in concert, as an important spoke within a broader conspiracy of fellow drug distributors to whom he has been linked. As several federal courts have previously noted, "such a conspiracy is presumptively a dangerous activity," often warranting imposition of pretrial detention as a consequence of the drug organization's scope and resources.[49]

The same is true here, where investigators have reported that Mr. Taylor, even while presently incarcerated on the instant federal indictment, has allegedly attempted to continue coordinating drug distribution activities involving the network of cell phones previously known to have fulfilled heroin orders.[50] In view of this evidence, I note for the record that continued detention of this

---

[48]   United States v. Dillard, 214 F.3d 88, 93 (2d Cir. 2000).
[49]   United States v. Duncan, 897 F. Supp. 688, 690 (N.D.N.Y. 1995).
[50]   ECF No. 29 at 7.

- 17 -

Defendant is commensurate with my decisions to detain other of his soon-to-be

co-Defendants with similar levels of involvement in the instant conspiracy, as

well as his reluctance to relinquish, even at this late hour, the organization's

raison d'être.

The evidence thus far presented to the Court also reveals that Mr. Taylor's

alleged investment in the instant drug conspiracy paid him lucrative dividends.

A financial records check conducted by agents with the Federal Bureau of

Investigation purportedly shows that Mr. Taylor deposited approximately

$88,000.00 into accounts he controlled during the year-and-a-half period from

April 2014 until October 2015.[51] In fact, investigators also turned up vehicle and

loan records pertaining to Mr. Taylor that show he is the owner of a Mercedes-

Benz, several Range Rover vehicles, and three motorcycles.[52] Curiously, however,

pertinent Pennsylvania Department of Labor and Industry records reveal that

Mr. Taylor was not been engaged in any legitimate employment during that

same time period.[53]

---

[51]   Id. at 3.
[52]   Id.
[53]   Id.

As to the statutory presumption applicable to this case, it is my view that where the text of a Congressional enactment so elucidates Congress's intent, judicial abrogation of that written policy disserves the narrow role our Constitution has carved for federal courts. "Indeed, the Supreme Court has cautioned that, to avoid improper narrowing by courts of congressional enactments, resort to judge-made exceptions to statutory grants must be rare."[54]

Accordingly, I hold that the Defendant has failed to overcome the statutory presumption of detention. I now will turn to the reasons why reopening his detention hearing would be futile.

**B.      The Detention Hearing Will Not Be Reopened Because the Defendant's Proposed Conditions Are Inadequate and Were Known at the Time of the Initial Determination.**

Section 3142(f) of the Bail Reform Act, which governs the reopening of detention hearings, provides that reopening is appropriate only when (1) "information exists that was not known to the movant" at the time of the initial hearing and (2) such novel information "has a material bearing" on the ultimate issue of detention. "Courts have interpreted this provision strictly, holding that hearings should NOT be reopened if the evidence was available at

---

[54] CLS Bank Int'l v. Alice Corp. Pty., 717 F.3d 1269, 1303 (Fed. Cir. 2013), aff'd, 134 S. Ct. 2347 (2014).

the time of the hearing." The Defendant here presents no new information that was unknown to him at the time of the initial hearing or that would materially bear upon my ultimate determination.

The Defendant suggests that he be released to live with specific family members in Philadelphia pending trial. According to the Defendant, he has lived the majority of his life at his grandmother's home in Philadelphia.[55] He further suggests that his grandmother requires daily care as a result of certain orthopedic injuries.[56] Further, Mr. Taylor represents that he has significant ties to the Philadelphia community, including to his sister, who, like his grandmother, would also be willing to post her residence as bond.[57]

I agree with the Government that the proposed conditions are inadequate, cumbersome, and a poor guarantee of both Mr. Taylor's continued appearance and the public's safety. I am unconvinced that Mr. Taylor's ailing grandmother, for whom he sometimes serves as a caretaker, is capable of preventing his flight or otherwise preventing illicit conduct from occurring within her home or otherwise at her grandson's direction. In addition, Mr. Taylor's history of

---

[55]   ECF No. 27 at 1 ¶ 7.

[56]   Id. at 2 ¶¶ 9–10.

[57]   Id. at 1–2 ¶¶ 7, 8, 11, and 12.

mobility between Philadelphia and central Pennsylvania suggests that release would do little at this juncture to further ensure his non-involvement with statewide drug trade.

These shortcomings are exacerbated by the fact that Mr. Taylor has apparently continued to attempt to control drug distribution activities even during his instant incarceration. In light of that rather startling reality, I agree with the Government's rendition of the circumstances: "Surely if Taylor can continue to conduct drug operations while in custody, the proposed conditions will hardly be effective in curtailing his activities and ensuring the safety of the community."[58] As highlighted more thoroughly in Part III.A, my decision as to the proposed conditions' inability to ensure the public safety is further fortified by Mr. Taylor's criminal history and his proven track record with firearms.

In addition, Mr. Taylor suggests that continued pretrial detention would hamper his ability to prepare for trial.[59] To that end, the Court is entirely unclear as to how relocation to Philadelphia, hours away from court-appointed counsel would better facilitate adequate preparation.

---

[58]   ECF No. 29 at 7.
[59]   ECF No. 27 at 2 ¶ 15.

Last, I note for the record that the information contained within Defendant's motion was not shown to be novel or otherwise unknown to Mr. Taylor at the time Judge Arbuckle conducted the initial detention hearing. Quite the opposite, Mr. Taylor claims that he has, for the majority of his lifetime, enjoyed enduring ties to the people and places he proposes as part of his custodial arrangement. However, even considering all of the proposals in a light favorable to the Defendant for the sake of argument, they do not warrant pretrial release or alter the determination in any material way.

Accordingly, because the Defendant's proposed conditions are not newly acquired knowledge and nevertheless, are inadequate to materially alter the existing determination, his prior detention hearing need not be reopened, and the initial order of detention shall remain in place.

## IV.    CONCLUSION

Having considered the evidence as presented and the factors set forth in 18 U.S.C. § 3142, the Defendant has failed to overcome the statutory presumption of detention and present any set of proposed conditions that would ensure his appearance and the safety of the community. Mr. Taylor poses no valid legal grounds for the reconsideration or vacation of his detention order. His proposed

conditions of release are inadequate to secure his further appearance and the

safety of our communities. Therefore, Magistrate Judge Arbuckle's order of

detention is affirmed and will remain in full force and effect pending trial.

An appropriate Order follows.


BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge